7702.   GEORGIA COTTON COMPANY *v.* CENTRAL OF
GEORGIA RAILWAY COMPANY.

The provisions of § 6137 of the Alabama Code of 1907, as to the mailing of notice to consignees by common carriers on the arrival of freight, have no application to the responsibility of railway companies of that State as insurers of freight when under the contract the shipment is intended to be delivered at a private or other siding, even though such siding be within the corporate limits of a city having a daily mail.

DECIDED MARCH 20, 1917.

Complaint; from city court of Savannah—Judge Freeman. April 24, 1916.

*Adams & Adams,* for plaintiff.

*Lawton & Cunningham, H. W. Johnson,* for defendant.

JENKINS, J.   This was a suit in the city court of Savannah, by the Georgia Cotton Company, as shipper and consignee, against the Central of Georgia Railway Company, for the value of sixty-five bales of cotton, transported over the lines of the defendant from several points in Alabama to Troy, Alabama. The entire shipment being within the State of Alabama, counsel for both parties properly agreed to try the case according to the Alabama decisions. There was no disputed issue of fact, and, after the submission of the evidence on behalf of both parties, each of them asked that a verdict be directed in its favor. The trial judge directed a verdict in favor of the railway company.

It appears that the cars containing these sixty-five bales of cotton were burned while on the tracks alongside the west platform

of the Atlantic Compress Company, at Troy, Alabama, in a fire which originated in and which destroyed the compress. It was not contended that the defendant was in any wise responsible for the fire, or negligent in any act pertaining thereto. The cars containing the cotton involved in the litigation were detached and placed on the side-track along the platform of the compress company about 6 o'clock, p. m., November 23, 1910, and the fire destroying the cars and their contents occurred about 5 o'clock, a. m., on the following morning, November 24, prior to the hour at which the compress company would have opened for business had not the 24th been Thanksgiving day, a legal holiday. The railway company having admitted its receipt of the cotton for transportation, and the value of the cotton, pleaded that it had, before the destruction of the property, fully complied with its contract of shipment, by delivering the cotton to the duly authorized agent of the plaintiff, so as to relieve it entirely from further responsibility therefor. In furtherance of this defense it set up in its answer two distinct theories.

(1) According to the evidence of Carter, manager for the plaintiff company, the following written order was in force at the time of the shipment: "Troy, Ala., Sept. 1st, 1908. Central of Georgia Railway Company, Troy, Ala. You are hereby authorized and directed to deliver to the Atlantic Compress Company all cotton owned by or consigned to the undersigned or to our order at Troy, Ala., and also to deliver in the same manner all cotton shipped to 'order notify' of which we are or shall become owners by transfer, assignment, or endorsement of the bill of lading. The compress will receive and receipt to you for all such cotton as our agent. But it is expressly agreed that such delivery shall not operate to cancel or release your carrier's lien on any cotton on which freight charges have not been regularly paid. The order shall remain in full force and effect until revoked in writing. pp. Georgia Cotton Co., M. H. Carter." According to Carter's evidence the cotton in question was "not intended for sale or delivery by the Georgia Cotton Company, at Troy, but was intended for reshipment." He testified that the cotton company did not desire and had not required cotton deliveries to be made at the regular depot or warehouse of the railroad company at Troy, but did desire and had required it to be delivered on the said regular side-track of

37

the compress company, running along the western side of the com-press and known as the compress and guano side-track. He fur-ther stated in his testimony, that it had been the custom for the plaintiff's cotton to be placed on this side-track at night when the freight so arrived. According to his evidence, the purpose of the cotton company in having the cotton sent to this side-track was that it might be reweighed and classed at the compress, although it further appears, from the evidence, that the railway company might proceed to have such cotton compressed when so delivered, and, if objection thereto was made by the shipper, a different and higher freight rate might be charged. Evidence was adduced in behalf of the defendant from W. T. Steeger, the manager of the compress company, showing that prior to the said shipment an oral agreement had been entered into between him, as such manager, and Boone, the agent of the railway company at Troy, whereby the railway company was to furnish to the compress company an ab-stract showing the car numbers and contents, relating to all cotton delivered on the said track after the closing hours, this abstract to be given to the night-watchman of the compress company. This arrangement, as to the method of delivery after business hours, had been suggested by him, as manager of the compress company, and was made in order to facilitate the handling of cotton in the early morning, and in order to avoid delay in the unloading of the cot-ton. He testified that this arrangement had been in force from 1906 until and including November 24, 1910. The evidence showed that the plaintiff itself had no knowledge of such arrange-ment. Steeger stated that this oral agreement as to the delivery of shipments of cotton after business hours, while it accorded, as he understood it, with the usual written contract as subsequently entered into between the railroad and the compress company as to the delivery of cotton, had also been made, as to the details, for what he considered to be the best interests of the parties con-cerned. The evidence for the defendant showed that the con-ductor of the railway company had placed and detached the cars containing this cotton on this side-track to the compress platform about six o'clock p. m., November 23, 1910, and that an abstract showing the numbers and contents of the cars so placed was taken to the office of the superintendent of the compress company and placed upon his desk about eleven o'clock, p. m., of the same even-

ing by the cashier of the railway company's freight office at Troy, and that the night-watchman of the compress company had been notified that the abstract had been left on the superintendent's desk.

(2) The defendant further pleaded the provisions of section 5 of the bills of lading under which the shipments were made, and which were attached by the plaintiff to his petition, to wit: "Property destined to or taken from a station, wharf, or landing at which there is no regular appointed agent shall be entirely at risk of owner after unloading from cars or vessels or until loaded into cars or vessels, and when received from or delivered on private or other sidings, wharves, or landings, shall be at owner's risk until the cars are attached to and after they are detached from trains, or until loaded into and after unloaded from vessels."

There seems to be no question that, for several years prior to the shipment involved, all the plaintiff's cotton had been regularly delivered by the railway company in cars on this side-track of the compress company platform at Troy, and that plaintiff had knowledge of this fact. The testimony of Carter, the manager for plaintiff company, of Steeger, manager of the compress company, and of Boone, the agent of the railway company, at Troy, all agreed as to this. The evidence of Carter indicated that this side-track adjacent to the platform of the compress company was used exclusively for the purposes of the compress company, and was not a public track used by the railway company for its general business, and that it was generally known as the side-track of the compress company. There was some evidence, however, showing that occasionally this track was used, at a point opposite the extreme south end of the compress, for unloading freight for another party, and also that it was used by the railway company to obtain access to the storage house of the Standard Chemical & Oil Company, which is at the extreme southern end of this track and across the street from the compress company. All the witnesses seemed to agree, however, that the track adjacent to the platform of the compress company was used primarily and almost exclusively for the purposes of the compress company, and the president of the compress company testified that it was located on the property of the Troy Compress Company, which at the time of this shipment was operated by the Atlantic Compress Company.

1.   The plaintiff, in his petition, set forth § 6137 of the Code
of Alabama of 1907, which provides as follows: "A common car-
rier, if the place of the destination of freight is a city or town
having a daily mail, is not relieved from liability as a common
carrier by reason of a deposit or storage of freight in a depot or
warehouse, unless, within twenty-four hours after the arrival of
such freight, notice thereof is given to the consignee, personally
or through the mail; and if notice is given through the mail, the
postage must, by the consignee, be refunded to the carrier." The
rule as to the time when the liability of a railway company as a
common carrier ceases, under the Alabama law, appears to be dif-
ferent from the rule which obtains in Georgia.   Our State fol-
lows what is known as the Massachusetts rule (embraced in
§ 2730 of our Civil Code), to the effect that when the transporta-
tion is ended and the goods are ready for delivery at destination,
the liability imposed as a common carrier is ended; but Alabama
follows what is known as the New Hampshire rule, as interpreted
by the Michigan court, through Judge Cooley, to the effect that
the carrier is liable as an insurer, not only during the transit, but
until it has notified the consignee of the arrival of the goods at
the point of destination, and until he has had a reasonable
time to effect their removal.   McMillan *v.* Michigan S. & N. I. R.
Co., 16 Mich. 100 (93 Am. D. 208).   Quite a clear and concise dis-
cussion of the different rules of liability will be found in 18 L. R.
A. (N. S.) 427, in a note to the case of Poythress *v.* Durham &
S. Ry. Co., 148 N. C. 391 (62 S. E. 515).   In the decision, as well
as in the note here referred to, each rule is stated, with citations
showing the States in which it has been followed, and it is said
that the New Hampshire rule is followed by most of the courts
of this country, including those of Alabama.   In L. & N. R. Co.
*v.* Oden, 80 Ala. 38, which appears to be a leading Alabama
case, the Supreme Court of that State says (p. 41): "Until the
consignee has had a reasonable opportunity to remove the
goods, the liability of the railroad company as a common car-
rier continues; but on his failure to do so, the company is only re-
sponsible thereafter as a warehouseman or keeper for hire." In
Collins *v.* Ala. G. S. R. Co., 104 Ala. 395 (16 So. 140), the
Supreme Court of Alabama says: "According to the decisions of
this court, without reference to any statute on the subject, the lia-

bility of a railroad company as a common carrier of goods transported over its line does not cease on the arrival of the goods at their destination and their deposit there in a warehouse, but continues until the lapse of a reasonable time for the removal of the goods by the consignee, and its liability as a warehouseman does not begin until its liability as a common carrier has ceased. Columbus &c. R. Co. v. Ludden, 89 Ala. 613 (7 So. 471); Anniston &c. R. Co. v. Ledbetter, 92 Ala. 326 (9 So. 73). As a general rule, the undertaking of a common carrier to transport goods to a particular destination includes the obligation of a safe delivery of them to the consignee."

Section 6137, pleaded in the petition, and which provides how a common carrier may be absolved from liability as an insurer on arrival of freight at its depot or warehouse, sets forth, in effect, that a common carrier is not relieved from such liability, even after the goods are deposited in its depot or warehouse, unless, within twenty-four hours after the arrival of the freight, notice is given the consignee, personally or through the mail. This statute has, of course, been before the Alabama courts a number of times. It was doubtless intended to settle the question in Alabama—about which the decisions of many States are in conflict—as to whether or not a consignee must be notified of the arrival of goods, and also to fix the time when the liability as a common carrier ceases. In Central of Ga. Ry. Co. v. Burton, 165 Ala. 425 (51 So. 643), the court, in discussing this statute, said, with reference to a town having a daily mail, "Of course the statute applied to continue the relation as common carrier, unless the notice provided for was given." In Hearn v. Louisville & Nashville R. Co., 6 Ala. App. 483 (60 So. 600), this statute was before the Alabama Court of Appeals, and it appears that not only must the twenty-four hours expire, but also forty-eight hours after the giving of the notice, there being another Alabama statute allowing the consignee this additional forty-eight hours to remove his freight.

Thus, it would appear that the Alabama statute and decisions have rendered quite clear the determination of the question as to when the liability of a railway company in that State terminates as that of a common carrier and begins as that of a warehouseman; and had the cotton involved in the present transaction been carried by the railway company to its depot or warehouse, its liability, un-

der the facts outlined, would have been manifest. In the instant case, however, the question would appear to be, not whether the railway company was liable as an insurer, by virtue of its duties as a common carrier, or as a warehouseman, under the rule applying where the shipment had been delivered to its depot or warehouse and the notice given, but rather the question is as to whether, at the time of the destruction of the property, the liability of the defendant had altogether ceased by virtue of the delivery of the freight to the consignee, through its duly authorized agent. If this be correct, as to the issues involved in the case at bar, then the Alabama statute and decisions relied upon by the plaintiff in error, and which distinguish the liability of a common carrier as an insurer and as a warehouseman, could have no relevancy to the question we are called upon to determine. This would seem to be certainly true unless the written order given by the plaintiff to the railway company, authorizing and directing it to deliver its cotton to the Atlantic Compress Company, meant that all such deliveries should be made from the depot or warehouse of the railway company in the usual way. If it must be conclusively presumed from the quoted authority given by the plaintiff to the defendant that such was the intention of the parties, then the Alabama code-section and the rulings thereon, referred to, would have a proper and controlling application. We think, however, that all the evidence in the case clearly indicates that it was the intention of both parties, the cotton company and the railway company, that such shipments should be delivered to the compress company, not from the depot or warehouse of the railway company, but at the side-track along the plant of the plaintiff's agent, the compress company. It will be recalled that Carter himself testified that this had been the custom in previous deliveries, and that cotton reaching Troy at night had been then placed upon the side-track referred to. Thus, the shipment not being intended for delivery from the depot or warehouse of the railway company, we think the provisions of the Alabama code-section have no application to the case at bar, since the statutory notice therein provided for relates only to deliveries by the railway company from its own depot or warehouse.

In the rulings of the Supreme Court of Alabama it has been held that a railway company may, by custom or contract, make

valid delivery of freight by merely placing the car upon a side-track in a place where there is no agent of the company to receive it, and this is true when neither the consignee nor any one representing him is there to accept the freight. See South & North Ala. R. Co. v. Wood, 66 Ala. 167 (41 Am. R. 749), s. c. 71 Ala. 215 (46 Am. R. 309); So. Ry. v. Barclay, 1 Ala. App. 348 (56 So. 26). If it were true that the cotton involved in the present litigation had been taken by the railway company to its depot or warehouse for delivery, then we would not be inclined to think that such a contract as is relied upon in the present case would be binding, under the rulings made in that State, although, under Alabama decisions, even where delivery is intended to be made from the company's own depot, the rules of liability can be modified by contract made between the parties. The tendency of the courts of that State seems to be to limit, rather than enlarge, such right of contract. In the case of Steele v. Townsend, 37 Ala. 247 (79 Am. D. 49), the court says: "It is of the utmost importance to the commerce of the country that carriers should be held to a strict accountability. On this subject, we concur in the remarks of Chief Justice Gibson, that 'though it is perhaps too late to say that a carrier may not accept his charge in special terms, it is not too late to say that the policy which dictates the rule of the common law requires that exceptions to it be strictly interpreted, and that it is his duty to bring his case strictly within them.' Atwood v. Transportation Co., 9 Watts, 87 [34 Am. D. 503]. This is especially so in reference to exceptions inserted in bills of lading." In Louisville & N. R. Co. v. Oden, 80 Ala. 38, the court held that a stipulation in a bill of lading that the railroad company shall be liable only as a warehouseman, after the arrival of the freight at the point of destination, and that the consignee shall receipt and take it away as soon as it is ready for delivery, without providing for a notice to the consignee when it is ready, is unjust and unreasonable. That decision, however, was reviewed by the Supreme Court of Alabama, in the case of Western Railway of Ala. v. Little, 86 Ala. 159, 161 (5 So. 563), from which we quote: "In L. & N. R. R. Co. v. Oden, 80 Ala. 38, we ruled that a special contract, by which the company's liability as a common carrier was terminated on the arrival of the freight at the depot, and the failure of the consignee to receive and remove

it as soon as ready for delivery, without notice, was unjust and unreasonable; but pretermitted an expression of opinion (a decision of the question not being required by the case) whether a railroad company may by special contract terminate its liability as carrier at a time earlier than that fixed by law for its continuance. The question is now directly presented, both by demurrer to pleas and instructions to the jury. Appellee contends that the provisions in the bill of lading comes within the rule which forbids a common carrier to contract for exemption from liability for damages caused by his own negligence. We do not so interpret the stipulation. It does not purport to release the company from any risk whatever, ordinary or extraordinary, attached by law to the employment of a common carrier while the goods are in transitu. The intention and effect are to fix a period, after the transportation is complete, when the goods pass from the custody of the company as a carrier to their keeping as warehouseman." Thus, it will be seen from the decisions just quoted from, all of which pertain to deliveries from railway depots or warehouses, that while the general rule of liability may be to some extent modified by express contract, the courts of that State seem disposed to limit within reasonable bounds the right of contract in contravention of the general rule; and did the contract relied upon in the present case pertain to such a delivery, we would be strongly disinclined to uphold its validity. Where, however, it is intended that the delivery shall be made at a private siding, the rule is altogether different, and the courts are much more liberal in their grant of authority relating to private contracts, exempting railroads from liability. Indeed, the general rule seems to be that where, by custom or contract, the duty of the carrier is performed when it places on a side-track the car containing the goods, ready for unloading, by the consignee, then from that time the liability of the carrier as carrier ceases. The Supreme Court of Alabama holds that in the absence of any specific provision on the subject in the contract of shipment, the shipper's assent to such delivery is implied from the mere fact that he knew the carrier had no agent at the particular place to which the consignment was made. In South & North Ala. R. Co. *v.* Wood, supra, it was said: "We can see no reason why a railway company, acting as a common carrier, can not stipulate, by a contract express or implied, that

their liability as a common carrier shall terminate with a delivery at a particular point, and that they will assume no liability at all, in such case, as warehousemen. If the consignee is fully advised, at the time of shipment, that the company has no agent at the particular station or place to which the consignment is made, and the failure to employ such agent is not shown to be unreasonable in view of the condition of the company's business, there is, in the absence of rebutting circumstances, an implied consent that the carrier's responsibility shall be dissolved, when he has done all that the nature of the case permits him to do, according to the reasonable and proper usages of his business. The delivery of the carload of corn on the side-track at 'Smith's Mills' terminated the liability of appellant. It would be unreasonable to require the railroad company to employ a special agent to keep the corn in further custody, unless there was an agreement, express or implied, to do so. When the consignee was informed that there was no agent of the company there, he was virtually told that there would be no custody of the goods by the carrier after arrival. The shipment, after such knowledge, was an assent on the part of the shipper, to the implied conditions." When the same case was again before the court (71 Ala. 215) it was again recognized that so far as any question of liability on the part of the carrier to the shipper was concerned, the carrier's control over the car and its contents was to be regarded as having ended when the car was placed on the side-track at the point of destination, and that there was no liability on its part for any loss of the contents of the car thereafter occurring.

In the case of Stone v. Rice, 58 Ala. 95, 98, the court says: "Doubtless a deposit, sanctioned by usage, of the goods in question on the river bank, at Gore's Landing, within view of, and where they could be protected by the warehouseman, whether so protected in fact or not, would have been good." This court held, in *Bainbridge G. Co.* v. *A. C. L. R. Co.*, 8 *Ga. App.* 677 (70 S. E. 154), that "There is nothing in the public policy of this State or of the State of Alabama to prevent a shipper and carrier from contracting as to when cars loaded upon a side-track shall be considered as delivered to the carrier; and in such case delivery under the agreement may not actually take place, although the car is loaded and sealed and a bill of lading issued by the carrier." The con-

verse of the proposition must be equally true, namely, that a consignee and a carrier may, without contravening any rule of law or public policy, contract as to when cars of freight placed upon a side-track shall be considered as delivered, so as to absolve the carrier from any further duty or liability in regard thereto.

It is contended, however, by counsel for the cotton company that the agreement referred to as entered into by the agent of the railway company and the agent of the compress company, whereby the parties undertook to prescribe the method of receiving cotton on behalf of the cotton company when delivered after business hours, is not binding upon the compress company, because it had no knowledge of and did not enter into the agreement as to what should constitute such a delivery. But inasmuch as the statutory law can not have application, we see no reason why the compress company, as the duly authorized general agent of the cotton company to receive for it all cotton consigned to it at Troy over the lines of the defendant, could not arrange, by such an agreement, for the manner and method by which it desired that such deliveries should be made. Under the evidence in this case the railway depot was three hundred yards distant from the compress company's buildings and track, and it would seem unreasonable, therefore, to require the railway company to place the cotton upon the side-track of the compress company where it would be out of the railway company's supervision and under the care and custody of the watchman or other employees of the compress company, without relieving the railway company of further responsibility as to the delivery, especially where, as in this case, the duty of breaking the seals and unloading the cars was always performed by the compress company as agent of the cotton company.

2. In addition to the defense of delivery, set up by the defendant, in accordance with the authority granted to the compress company as its agent, and the contract made in pursuance thereto, the defendant contended that section 5 of the bills of lading, already quoted, under which this cotton was shipped, clearly exonerated it from liability under the facts of the case. It will be needless, in this connection, to again cite or quote from the decisions governing the delivery of freight on private or other sidings. The statement of the evidence in this case makes plain the essential facts that the cotton was intended for delivery to the.

agent of the plaintiff on the tracks of the compress company, that this track was a private or other siding, within the meanings of the bills of lading, and that the cars, containing the cotton, were placed at the compress platform on this track, and detached from the railway company's train, some hours before it was destroyed in the compress fire.

So far as the bills of lading are concerned, though not signed by the shipper, they are valid and binding under the laws of Alabama, which differ in this respect from the Georgia rule. In Alabama a bill of lading is regarded as a special contract, if accepted by the shipper with knowledge or opportunity of knowledge of its contents. Steele *v.* Townsend, supra; Western Ry. of Ala. *v.* Little, supra; Jones *v.* Cincinnati &c. Ry. Co., 89 Ala. 376 (8 So. 61). Moreover, in the case at bar the cotton company sued upon the bills of lading and attached them as exhibits to its petition.

It is contended, however, by the plaintiff in error, that the clause in the bills of lading referred to, and the decisions of the Alabama court, relating to deliveries at side-tracks, have reference only to such deliveries made on sidings in the country, and do not pertain to deliveries made within the limits of a corporate city having a daily mail. We do not think it true, however, that any reason is apparent in law or in logic why a like valid delivery may not be made by agreement between the parties, even where the side-track or special point for delivery happens to be within the corporate limits of such a city or town. Nothing in Alabama code-section 6137 inhibits such delivery. It is frequently the only method of delivery which can be made. If it is not competent for the carrier and the owner to agree that such a delivery shall be valid, the result would be to paralyze many great industries whose factories or plants are situate within the corporate limits of large cities, and who depend entirely upon this method of delivery. Many large manufactories and warehouses in such cities are miles distant from the railway company's depot or regular place of delivery, and they receive freights only in cars on side-tracks, at their factories. A common carrier could not be expected, or legally required, to surrender its custody and control over freight by placing the cars on such a side-track, if it is still to be held responsible for the property.

*Judgment affirmed. Broyles, P. J., and Bloodworth, J., concur.*